# SCHOOL TRANSITION AND ASSET PURCHASE AGREEMENT

This School Transition and Asset Purchase Agreement (this "Agreement") is made and entered into as of December 17, 2025 (the "Effective Date"), by and among:

**THE PARTIES:**

1. **THE FRAZER SCHOOL, INC.**, a Florida corporation located at 13226 SW 1st Place, Newberry, Florida 32669 (the "School");
2. **NEWBERRY CHRISTIAN COMMUNITY SCHOOL, INC.**, a non-profit corporation located at 1520 NW 34th Street, Gainesville, FL 32605 ("NCCS");
3. **JAMES R. SCHRADER** and **RACHEL E. SCHRADER**, husband and wife, residing at 13226 SW 1st Place, Newberry, Florida 32669 (the "Schraders" or "Shareholders"); and
4. **EDGE CONTENT, LLC**, a Florida limited liability company located at 2510 NW 16th Avenue, Gainesville, FL 32605 ("Edge Content").

**Third Party Beneficiaries:**

Kurt Dudas and Brittany Dudas, whose address is 1031 SW 131st Street, Newberry, FL 32669 (the "Dudases"), shall be third-party beneficiaries of this Agreement with respect to the rights and obligations expressly conferred upon them herein. Edge Content and the Dudases are each a "Lender" and, collectively, the "Lenders").

The above are referred to collectively as the "Parties" and each individually as a "Party."

## BACKGROUND

The Schraders own one hundred percent (100%) of the issued and outstanding stock of the School.

The School currently operates as a for-profit corporation but desires to convert to a not-for-profit corporation to ensure long-term viability and better serve the community.

The School is indebted to Kurt and Brittany Dudas pursuant to a Promissory Note and Security Agreement dated November 17, 2025, in the principal amount of $3,175,000, with total indebtedness as of the Effective Date of no less than $3,193,789.04.

The School has also entered into a Promissory Note and Security Agreement with Edge Content.

NCCS owns the real property and improvements located at 4700 NW 89th Boulevard, Gainesville, FL 32606 (the "Building").

The Parties have agreed to execute a plan wherein: (i) the Schraders resign as officers of the School, effective immediately; (ii) the existing Board of Directors resigns and is replaced by a newly elected Board of Directors that is granted plenary power over all aspects of the School; (iii) the School initiates efforts to convert to a not-for-profit 501(c)(3) entity; (iv) the School purchases the Building from NCCS; and (v) the Shareholders enter into an Irrevocable Proxy Agreement.

The Parties have had ample opportunity to receive the advice of counsel in the preparation, drafting, and execution of this Agreement, which was negotiated in good faith and at arm's length.

## ARTICLE 1: COMPLETE TRANSFER OF CONTROL

### 1.1 Transfer Date and Immediate Effect

December 17, 2025, shall serve as the definitive "Transfer Date." Effective as of 12:01 AM on the Transfer Date, all governance and decision-making authority for the School shall transfer to and vest

exclusively in the members of the School's newly elected Board of Directors (the "Educator Board"), which shall assume full control over the business and operations of the School.

**1.2 Actions Required on Transfer Date**

The Shareholders shall execute a binding, unanimous written consent in substantially the form of Exhibit A that: (a) accepts the resignations of the School's current officers and existing Board of Directors; (b) appoints Will Frazer, Olanrewaju Fayiga and Maxim Dolinsky to serve as the Educator Board and appoints the Educator Board as the sole governing body of the School; and (c) amends the School's Bylaws to provide that, for so long as the School or the Shareholders are indebted to the Lenders: (1) the composition of the School's Board of Directors shall not be altered or amended without the written consent of the Lenders; (2) the Educator Board shall have exclusive control and management of the affairs and operations of the School and shall exercise all powers that may otherwise be exercised by the Shareholders; and (3) the School's organizational documents, including but not limited to its Bylaws and Articles of Incorporation, cannot be amended without the written consent of the Lenders.

The Shareholders will enter into an irrevocable proxy and share purchase agreement in substantially the form attached hereto as Exhibit G.

**1.3 Complete Removal of Schrader Authority**

Upon the Effective Date, the Schraders shall: (i) relinquish control and management of the School; (ii) resign from the board of directors of the School and as officers of the School; and (iii) relinquish all express and apparent authority to act for the School.

From and after the Transfer Date, the Schraders shall not, directly or indirectly: (a) interfere with, disrupt, or attempt to influence the operations, management, or governance of the School; (b) communicate with School employees, contractors, or vendors regarding School operations without prior written consent of the Educator Board; (c) communicate with parents, students, or prospective families in a manner that disparages the School, the Educator Board, or the Lenders, or that undermines confidence in the School's operations; (d) access School premises without prior written consent of the Educator Board, except as required for transitional support; (e) attempt to assert any control, authority, or influence over the School's affairs; or (f) take any action inconsistent with the complete transfer of control to the Educator Board. Any violation of this covenant shall constitute a material breach of this Agreement, entitling the non-breaching parties to specific performance, injunctive relief, liquidated damages of $5,000 per violation, and recovery of attorneys' fees and costs.

**1.4 Release of Shareholders from Future Liability**

Upon completion of all of the actions described in Sections 1.1 – 1.3 above (collectively, the "Transfer Actions"), the Shareholders shall have no further responsibility or liability for any actions, decisions, or omissions of the Educator Board in connection with the governance, management, or operation of the School. For the avoidance of doubt, this provision releases the Shareholders only from liability for future actions of the Educator Board occurring after the Transfer Date and does not release, waive or limit any liability for any actions, decisions or omissions occurring prior to the Transfer Date.

The Shareholders acknowledge that, as of the Transfer Date, the Educator Board's decisions regarding operational strategy, including whether to pursue nonprofit conversion, are within the Educator Board's sole business judgment and discretion, and the Shareholders shall have no right to challenge such decisions or claim damages based on the Educator Board's strategic choices.

**1.5 Board Compensation**

As of the Transfer Date, members of the Educator Board shall not receive any compensation for their services as Directors. However, nothing in this Agreement shall preclude a Director from serving the

School as an employee and receiving compensation for such services, provided that such compensation is paid in accordance with the School's established compensation plan for their employment role.

## ARTICLE 2: BUILDING PURCHASE

### 2.1 Binding Commitment to Sell

NCCS hereby agrees to sell the Building to an entity selected by the Educator Board and the Lenders. The closing of such sale (the "Building Closing") shall occur as soon as reasonably practicable after the Financing (as defined in Article 4) is secured, but in no event later than twelve (12) months after the Effective Date (the "Closing Deadline").

### 2.2 Purchase Price Formula

The purchase price for the Building shall be calculated strictly as follows:

- **Mortgage Payoff**: The amount necessary to satisfy the existing mortgage held by NCCS (estimated: $4,000,000.00); PLUS
- **Joiner Construction Debt**: The amount necessary to satisfy the construction debt owed to Joiner Construction for renovations (estimated: $3,250,000); MINUS
- **Equity Credit to the School**: $5,119,262.85.

### 2.3 Price Cap and Verification Requirements

In no event shall the total purchase price for the Building (excluding the equity credit to the School) exceed $8,383,821.85 (calculated as $13,503,084.70 - $5,119,262.85).

NCCS acknowledges a credit of $5,119,262.85 already paid by the School to NCCS, which shall be deducted from the Building purchase price.

### 2.4 Interim Occupancy Arrangement

During the period between the Effective Date and the Building Closing, the School's occupancy of the Building shall operate strictly as a financial pass-through arrangement. Accordingly, the Educator Board, using the School's available funds, if any, shall make all mortgage payments directly to Capital City Bank. In addition, the Educator Board, using the School's available funds, if any, will be responsible for its proportionate share of utilities, routine cleaning, minor repairs, and upkeep for the portion of the Building actually utilized by the School in its day-to-day operations. NCCS explicitly agrees that it shall not charge the School any additional rent, profit, administrative fees, or markups on these costs. Notwithstanding anything to the contrary, if the Building Closing has not occurred by the Closing Deadline, this pass-through arrangement shall immediately terminate, and the School shall thereafter pay NCCS a fixed monthly rent of $100,000.00, beginning with the first full calendar month following the Closing Deadline.

## ARTICLE 3: FINANCIAL TRANSITION AND OPERATIONAL CONTROL

### 3.1 Immediate Financial Control

Commencing on the Transfer Date: (a) The Educator Board shall ensure that all mortgage payments are made directly to Capital City Bank using the School's available funds; and (b) NCCS shall no longer make mortgage payments using the School's funds.

### 3.2 Separation of Expenses

Commencing on the Transfer Date: (a) The Educator Board shall use the School's available funds, if any, to pay the School's operational bills directly; (b) NCCS shall not pay any bills on behalf of the

School unless specifically requested in writing by the Educator Board; and (c) Neither NCCS nor the Shareholders shall access or use the School's funds for any purpose whatsoever.

**3.3 Access to Financial Records**

The Lenders, through their designated representative, immediately upon the Effective Date, will have the right at least four times per month to: (i) visit and inspect the corporate office(s) of the School; (ii) examine and copy the books and records of the School; and (iii) discuss the affairs, finances and accounts of the School with their officers and independent public accountants.

The Shareholders shall, within two (2) days of executing this Agreement, provide the Educator Board and Lenders with full access to the School's financial books, records, bank account(s), Quickbooks account, and other related accounts and documents. Neither the Shareholders, the School, nor the Educator Board shall change login credentials or account passwords without the consent of the other one(s) of them.

**3.4 Lender Representative**

During the Forbearance Period, as defined below, the Lenders will have the right, in their sole and absolute discretion, to designate a representative to visit the corporate offices of the School for up to two business days per week, which days may be consecutive, to observe the School's compliance with their ongoing obligations under this Agreement and the loan documents (the "Forbearance Representative"). During the Forbearance Period, (i) the Forbearance Representative shall be (a) copied on all key communications regarding the School's finances and operations, and (b) invited to participate in all key in person, telephonic or teleconference meetings regarding the School's finances and operations, and (ii) the School will provide the Forbearance Representative with updated financial information. The Forbearance Representative will not be an officer or employee of the School and will report directly to the Lenders. The Lenders shall be responsible for the cost of the Forbearance Representative.

**3.5 Transportation Assets**

The Parties confirm that the two (2) Ford Transit Vans (15-passenger) currently used for student transport are the sole property of the School. The School's transportation operations shall continue without interruption.

**ARTICLE 4: DEBT OBLIGATIONS AND FINANCING**

**4.1 Acknowledgment of Existing Debt**

As of the Effective Date, the School is indebted to the Dudases pursuant to the loan documents in the amount of no less than $3,193,789.04 solely in respect of: (i) principal outstanding and (ii) accrued interest. In addition, the School is indebted to Edge Content pursuant to the loan documents in the amount of no less than $500,000.00 solely in respect of: (i) principal outstanding and (ii) accrued interest. The School acknowledges and confirms the validity of all amounts owing to the Lenders.

The School acknowledges that it has been and continues to be in default under the loan documents, and that because of the occurrence of the default, the total indebtedness is now due and payable in full, and, but for the terms and conditions of this Agreement, the Lenders are permitted and entitled to enforce security interests or otherwise exercise any rights or remedies available under applicable law.

**4.2 Reaffirmation of Loan Obligations**

The Parties explicitly acknowledge that The Frazer School Inc., regardless of its conversion to a non-profit entity, hereby reaffirms, assumes, and ratifies that certain Promissory Note dated November 17,

2025, in the principal amount of $3,175,000.00 in favor of Kurt and Brittany Dudas. The conversion to non-profit status shall not alter this obligation.

The Parties explicitly acknowledge that The Frazer School Inc., regardless of its conversion to a non-profit entity, hereby reaffirms, assumes, and ratifies that certain Promissory Note dated May 21, 2025, in the principal amount of $500,000.00 in favor of Edge Content, LLC. The conversion to non-profit status shall not alter this obligation.

The School hereby ratifies and affirms the loan documents and acknowledges that the loan documents are, and shall remain, unchanged (except as expressly set forth herein) and in full force and effect, and the liens granted in the collateral thereby and held by the Lenders as of the Effective Date shall and do remain in full force and effect as valid and perfected liens and security interests in favor of the Lenders and their successors and assigns.

**4.5 New Financing and Strategic Debt Reduction**

The School may seek a commercial loan of approximately $10,000,000.00 to $12,000,000.00 (the "Financing") as promptly as reasonably possible following the Effective Date.

Loan proceeds shall be disbursed in the following order of priority:

1. Payoff of Capital City Bank Mortgage (~$4M);
2. Payoff of Joiner Construction Debt (~$3.25M);
3. Payment of School typical operating expenses to cover normal business operations and partial principal payment to Kurt and Brittany Dudas in the amount of $1,000,000;
4. Payoff of other long-term debt and/or for working capital.
5. **Reimbursement of Equity**: Reimbursement of the verified cash capital actually invested, contributed or paid by NCCS or the Schraders in connection with the acquisition or renovations of the Building; the "Reimbursement of Equity" component must be verified by an independent CPA Firm, and costs that cannot be verified with specific reasonable documentation shall be excluded. Following final determination of the amount of the Reimbursement of Equity in accordance with the terms of this Agreement, the School agrees to enter into a commercially reasonable promissory note with NCCS, on terms that are mutually agreeable to both parties, to document the obligation of the Reimbursement of Equity.

**4.6 Events Constituting Default Under This Agreement**

Each of the following will constitute a default under this Agreement: (i) any representation or warranty of the School or the Schraders contained in this Agreement proves to have been false or misleading when made or furnished; (ii) the School or the Schraders fail to keep or perform any of the covenants or agreements contained in this Agreement or take an action that is inconsistent in any material respect with any provision of this Agreement; (iii) the occurrence of any additional default under the loan documents; (iv) any act of bad faith, fraud, intentional misrepresentation, criminal or willful misconduct or gross negligence by the School or the Schraders; (v) the School or the Schraders commence a case, proceeding or other action against the Lenders relating to loan documents, this Agreement, or any action or omission by the Lenders or any of their agents in connection with any of the foregoing; and (vi) any sale or transfer, or attempted sale or transfer, by the School or the Schraders of any collateral, or equity in the School without the written consent of the Lenders. Upon the occurrence of a default, and without the need for notice, presentment or demand, the Lenders may immediately take legal action in accordance with the loan documents, this Agreement, and applicable law.

## ARTICLE 5: NONPROFIT CONVERSION

**5.1 Good Faith Efforts Toward Conversion**

The Parties agree that the Educator Board shall explore all options it deems available to provide the School with an improved chance of survival including, but not limited to, converting the School into a not-for-profit entity.

During the Forbearance Period, the Parties shall work in good faith to, among other things, finalize the sale of the School and finalize the sale of the real property on which the School operates.

**5.2 Transitional Support for Conversion**

The Schraders and NCCS acknowledge that their historical knowledge of the School's operations, financials, and the Building is critical to the conversion and acquisition process. Accordingly, the Schraders and NCCS agree to provide all reasonably necessary transitional support to the Educator Board, including assisting with financial audits, providing historical data for the IRS application, providing building maintenance records, and facilitating the transfer of operational knowledge.

## ARTICLE 6: SCHRADER OBLIGATIONS AND REPRESENTATIONS

**6.1 IRS Payroll Liability**

The Shareholders acknowledge that the School holds an outstanding payroll liability with the IRS. The Shareholders agree to provide full documentation regarding this liability to the Educator Board within three (3) business days of the Effective Date.

The Parties agree that, absent the imposition of a Trust Fund Recovery Penalty or other such similar penalty against either or both of the Shareholders, the School shall remain responsible for the payment of the principal amount of the payroll taxes owed. In addition, the Parties agree that the Shareholders, as individuals, shall be jointly and severally liable for the payment of all penalties and interest assessed by the IRS regarding said liability, including but not limited to failure to pay penalties and failure to file penalties. The Shareholders agree to satisfy their obligation for the penalties and interest in full within sixty (60) days of the Effective Date.

**6.2 Representations Regarding Assets and Liabilities**

The Shareholders represent and warrant that the List of School Assets, attached hereto as Exhibit C, the List of School Long-Term Liabilities, attached hereto as Exhibit D, and the accounts payable available inside the company's online Quickbooks account, attached hereto as Exhibit F, are true, accurate, and complete reflections of the School's financial position as of the Transfer Date. The Shareholders further represent that, to the best of their knowledge, there are no other material undisclosed liabilities or encumbrances on the School's assets as of the Transfer Date. In addition, the Shareholders represent and warrant that all costs and expenses of the School associated with any and all afterschool programs, teachers, and staff have been paid in full through December 1, 2025.

**6.3 Proof of Insurance**

Within ten (10) days of the Effective Date, the Shareholders shall provide the Educator Board with written proof of all current insurance policies held by the School, specifically including proof of Directors and Officers (D&O) liability coverage that extends protection to the members of the School's Educator Board.

## ARTICLE 7: RELEASES

**7.1 Protection of Educator Board Business Judgment**

Upon completion of all Transfer Actions, the Shareholders shall have no further responsibility or liability for any actions, decisions, or omissions of the Educator Board in connection with the

governance, management, or operation of the School occurring after the Transfer Date. The Shareholders acknowledge that the Educator Board's decisions regarding operational strategy are within the Educator Board's sole business judgment and discretion, and the Shareholders shall have no right to challenge such decisions or claim damages based on the Educator Board's strategic choices. This provision does not release, waive or limit any liability for any actions, decisions or omissions occurring prior to the Transfer Date.

**ARTICLE 8: GENERAL PROVISIONS**

**8.1 Governing Law and Jurisdiction**

This Agreement shall be governed by and interpreted, construed, and enforced pursuant to the substantive law of the state of Florida without regard to the choice of law rules thereof. Each Party (i) consents to the non-exclusive jurisdiction of the courts of the state of Florida, Alachua County, and (ii) agrees that venue shall be proper in any court of competent jurisdiction located in Alachua County, Florida to resolve any disputes or controversies between the Parties arising from or related to this Agreement.

Any legal action arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the state or federal courts located in the City of Gainesville, State of Florida, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such action. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any action in such courts and irrevocably waive and agree not to plead or claim in any such court that any such action brought in any such court has been brought in an inconvenient forum.

**8.2 Attorneys' Fees and Costs**

In the event of any legal action or proceeding instituted with respect to this Agreement, the party prevailing in such action or proceeding shall be entitled to collect from the non-prevailing party reasonable attorney fees, paralegal fees, law clerk fees and other legal costs and expenses, whether incurred at or before trial, and whether incurred at the trial level or in any appellate, bankruptcy or other legal proceedings.

**8.3 Specific Performance**

The Parties each acknowledge that the rights of each party to consummate the transactions contemplated by this Agreement are special, unique and of extraordinary character and that, in the event that any Party violates or fails or refuses to perform any covenant or agreement made by it in this Agreement, the non-breaching party may be without an adequate remedy at law. The Parties agree, therefore, that in the event that any Party violates or fails or refuses to perform any covenant or agreement made by such Party in this Agreement, the non-breaching Party or Parties may, subject to the terms of this Agreement and in addition to any remedies at law for damages or other relief, institute and prosecute an action in any court of competent jurisdiction to enforce specific performance of such covenant or agreement or seek any other equitable relief (without any requirement to post bond).

**8.4 Time is of the Essence**

Time is of the essence of this Agreement.

**8.5 No Waiver**

Failure to invoke any right, condition, or covenant in this Agreement by either Party shall not be deemed to imply or constitute a waiver of any rights, condition, or covenant and neither Party may rely on such failure.

**8.6 Binding Effect**

This Agreement and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

This Agreement shall be binding upon and shall inure to the benefit of the respective Parties, and their respective heirs, legal representatives, successors and permitted assigns. Neither Party may assign this Agreement without the prior written consent of the other Party, except that either Party may, without the consent of the other, assign the Agreement to a controlled subsidiary of that Party or an acquirer of all or substantially all of that Party's assets, provided the assigning party guarantees the performance of and causes the assignee to assume in writing all obligations of the assignor under this Agreement.

**8.7 Severability**

If any provision of this Agreement is held invalid, illegal or unenforceable for any reason, the parties agree that such invalidity, illegality or unenforceability will not affect the validity, legality or enforceability of the remaining provisions of this Agreement, if: (i) such invalidity, illegality or unenforceability does not materially affect the intent or economic bargain detailed herein; or (ii) the parties agree to substitute for the invalid, illegal or unenforceable provision a valid, legal and enforceable provision which most closely approximates the intent and economic effect of the invalid provision.

If any term or provision of this Agreement is held or deemed to be invalid or unenforceable, in whole or in part, by a court of competent jurisdiction, this Agreement shall be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, provided that the Agreement is not materially altered by deleting the invalid or unenforceable term or provision.

**8.8 No Third-Party Beneficiaries**

Other than the Dudases and the Lenders' affiliates, successors or assigns, the rights and benefits of this Agreement shall not inure to the benefit of any third party.

**8.9 Modifications**

No modification of this Agreement shall be binding or enforceable unless in writing and signed by or on behalf of the party against whom enforcement is sought.

**8.10 Counterparts and Electronic Signatures**

This Agreement may be executed in counterparts, each of equal import, which, when joined, shall constitute one document. Signatures may be delivered by electronic transmission and such signatures shall be treated as originals thereof. Any electronic copy of this Agreement, or of any counterpart, shall be deemed to be the equivalent of an original.

This Agreement may be executed in separate counterparts (including by manual telecopied or PDF signature pages), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

**8.11 Notices**

All notices, demands or other communications to be given or delivered by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (i) on the date of personal delivery to the recipient or an officer of the recipient, or (ii) on the next business day after deposit for

delivery with a nationally recognized commercial overnight delivery service, prepaid, to the following addresses:

**If to the Lenders (Edge Content, LLC):**

Edge Content, LLC, Attn: Ethan Fieldman, 2510 NW 16th Avenue, Gainesville, FL 32605

With a copy to: Roark Law Firm, P.A., Attn: Adam D. Roark, 1617 NW 16th Avenue, Gainesville, FL 32605; Email: adam@adamroarklaw.com

**If to the School:**

Frazer School, Inc. Attn: Frazer School Educator Board 4700 NW 89th Blvd., Gainesville, FL 32606

With a copy to: Eversheds Sutherland; Attn: Rachel Reid; 999 Peachtree St. NE, Atlanta, GA 30309; Email: rachelreid@eversheds-sutherland.us

**If to the Schraders:**

James and Rachel Schrader 13226 SW 1st Place Gainesville, FL 32669

With a copy to: Withers Harvey, P.A.; Attn: Richard I. Withers; 1120 NW 8th Avenue Gainesville, FL 32601; Email: richard@withersharvey.com

Any notice, request, instruction or other document to be given hereunder to any Party shall be in writing and delivered by hand, email, telegram, registered or certified United States mail return receipt requested, or other form of receipted delivery, with all expenses of delivery prepaid to the address set forth above.

**8.12 Tax Consequences**

This Agreement is enforceable regardless of its tax consequences. No Party makes any representations with respect to any tax consequences in connection with entry into this Agreement or any payments required hereunder.

**8.13 Authorization**

Each party to this Agreement represents and warrants that it/he has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement, and that this Agreement constitutes a valid and legally binding obligation, enforceable in accordance with its terms.

**8.14 Entire Agreement**

This Agreement constitutes the entire agreement among the Parties concerning the subject matter set forth herein and supersedes any and all prior and contemporaneous agreements, negotiations, understandings and communications of the Parties relating to the subject matter hereof, whether oral or written, with respect thereto. The School specifically acknowledges and agrees that it is not relying on any oral representation from the Lenders or any of their agents. The School and the Schraders agree to execute and deliver to the Lenders such other and further documentation and to undertake such further actions as the Lenders shall deem necessary to effectuate the provisions of this Agreement.

Each party to this Agreement shall take such further actions to execute, file, record, publish and deliver such additional certificates, instruments, agreements and other documents as the other party or parties

may, from time to time, reasonably request, in order to effectuate or otherwise to accomplish the purposes of this Agreement.

**8.15 Headings**

The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**8.16 Construction**

The fact that one of the parties may be deemed to have drafted or structured any provision hereof shall not be considered in construing the particular provision either in favor of or against such party.

**EXHIBITS**

The following exhibits are attached to and incorporated into this Agreement:

- **Exhibit A**: Unanimous Written Consent of Shareholders
- **Exhibit B**: Dudas Promissory Note and Edge Content Promissory Note
- **Exhibit C**: List of School Assets
- **Exhibit D**: List of School Long-Term Liabilities
- **Exhibit E**: NCCS Resolution
- **Exhibit F**: Accounts Payable
- **Exhibit G**: Irrevocable Proxy Agreement

## SIGNATURE PAGE

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**THE FRAZER SCHOOL, INC.**

By: ______________________________
Name: James R. Schrader
Title: President

**NEWBERRY CHRISTIAN COMMUNITY SCHOOL, INC.**

By: ______________________________
Name: James R. Schrader
Title: President

**JAMES R. SCHRADER** (Individually and as a shareholder of The Frazer School, Inc.)

______________________________

**RACHEL E. SCHRADER** (Individually and as a shareholder of The Frazer School, Inc.)

______________________________

**EDGE CONTENT, LLC** (as Lender)

By: ______________________________
Name: Ethan Fieldman
Title: President